### PEOPLE v. HUEBSCHER.

(Supreme Court, Appellate Division, Second Department. December 30, 1908.)

HOMICIDE (§ 254*)—MURDER—EVIDENCE—SUFFICIENCY.

Evidence *held* to sustain conviction of murder in the second degree.

[Ed. Note.—For other cases, see Homicide, Dec. Dig. § 254.*]

Appeal from Criminal Term, Queens County.

Joseph Huebscher was convicted of murder in the second degree, and he appeals. Affirmed.

Argued before WOODWARD, JENKS, HOOKER, GAYNOR, and RICH, JJ.

Fred G. De Witt, for appellant.
Ira G. Darrin, for the People.

RICH, J. This appeal is from a judgment convicting the defendant of the crime of murder in the second degree.

Gottlieb Scharrer was murdered on the afternoon of December 10, 1905, in a secluded spot at Forest Park, in the borough of Queens. An examination of the body revealed a number of wounds upon the head, that his throat had been cut, and a gunshot wound through the head, which produced death. No eyewitness of the killing was produced upon the trial; but the facts and circumstances detailed by the several witnesses point directly to the guilt of the defendant and are inconsistent with innocence. Scharrer had been employed by Moses Richheimer's Sons for about 10 years, and had a room on the top floor of the Richheimer residence, which was also occupied by the defendant for a few months previous to his arrest. Scharrer, by his thrift, had accumulated some money, which was deposited in the German Savings Bank. The defendant knew of this and in some manner became possessed of his pass book. A day or two before the killing, representing himself to be Jacob Helfer, he presented an order, signed by deceased, drawn upon the Savings Bank for the payment of this money to Jacob Helfer. Subsequently, under that name, he obtained the money and deposited it to his own credit in the Greenpoint Savings Bank. A young boy, James Ash, saw him draw this money from the bank, and he said to Ash, "You need say nothing to no one about this." In the afternoon of the next day the boy told one of the Richheimers of having seen a large roll of bills in the possession of the defendant, and Morris Richheimer acquainted defendant with the fact that he had knowledge that he was in possession of a sum of money.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Defendant entered the employ of Richheimer in October, 1905, and received $32 a month for his services. He had but a short time before appealed to his employer for a loan of $8 to purchase shoes and underclothing. He had obtained the signature of deceased in some manner not explained upon several blank sheets of paper, over one of which he had written the order upon the bank for the payment of the money. The defendant knew that the possession of this money was no longer a secret between himself and the boy, and it is a fair inference, as contended by the learned district attorney, that he believed that the deceased would soon learn this fact, and that he would within a short time discover the fact that his bank book was missing, and would institute inquiries at the bank, and in order to prevent deceased from suspecting that his bank book had been taken and that his money had been drawn out of the bank it became necessary to kill him. December 10th the defendant and the deceased, with other employés of the Richheimers, worked in the forenoon. Shortly after dinner the deceased went away from the house, wearing a dark overcoat and a derby hat. He had with him his watch, chain, and charm, and a scarf pin. The derby hat was found near the dead body of the deceased. Five months later the watch chain, charm, and scarf pin worn by deceased at the time he left Richheimer's were found, together with defendant's revolver, in a pickle keg securely closed in the loft of Richheimer's stable.

At about 2:30 p. m. three men were seen walking on Metropolitan avenue near the Fresh Pond road, about four miles from Richheimer's. "The man in the center drew back, and the others were urging him on —pulling him, so to speak, to go along." Dr. Fuchs, who saw them, said he heard one of the other men say to the man in the center, "Why don't you come along?" or "Why not come along?" or something like that. "My attention was directed as I passed by their attempt to pull this man along." These three men were walking east. The man in the center was identified as the deceased. The man on his right, and described, was identified by Dr. Fuchs as the defendant. About two hours later George Ruppel, a watchman in the employ of the Long Island Railroad Company, saw three men near his shanty at the crossing of Trotting Course lane and the Long Island Railroad leading from Long Island City to Rockaway Beach, at a point very near the northern entrance to Forest Park. This was about 4:36 p. m., and he identified a picture of deceased as being the man in the center. He testified they both got hold of the man by the arm and led him along, and the man was kind of lame, and he could not walk—something was the matter with him. "He didn't want to go. They kept on arguing with him, * * * and they got him as far as that corner, and they had a conversation. * * * All I could hear him say was, 'Ich vill heim.' They were saying to him, 'Ach, get mit'—in English, 'Come along.' They got him up the railroad track about 25 feet, one walking on each side as if they were leading him, and he made a certain nudge back, and he got away from them, and he came back again—came back to the crossing; and they followed him along. They had another conversation, and then went up to the left of the railroad track toward Myrtle avenue."

114 N.Y.S.—13

This was at a point about five minutes' walk from the place where the body was found and about five minutes before the killing. Ruppel identified the defendant as being one of the two. It is not disputed that he was with deceased but five minutes before the murder. Defendant said to Moses Richheimer, upon his return to the house that night: "You don't need to expect Gottlieb Scharrer back to work for you any more, * * * on account that you discharged the foreman and your sister-in-law."

The verdict of the jury was warranted by the evidence. The exceptions to the rulings of the learned trial court are without merit, and the judgment of conviction must be affirmed. All concur.